# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELAINE WANG, Derivatively on Behalf of Nominal Defendant ILLUMINA, INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) ) | |
| FRANCIS A. DESOUZA, SAM A. SAMAD, JAY FLATLEY, JOYDEEP GOSWAMI, JACOB THAYSEN, JOHN THOMPSON, STEPHEN P. MACMILLAN, FRANCES ARNOLD, CAROLINE DORSA, ROBERT S. EPSTEIN, SCOTT GOTTLIEB, GARY S. GUTHART, PHILIP SCHILLER, SUE SIEGEL, ANDREW TENO, and SCOTT B. ULLEME, | ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants, | ) ) ) | |
| and | ) ) | |
| ILLUMINA, INC., | ) ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Elaine Wang ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Illumina, Inc. ("Illumina" or the "Company"), against certain of the Company's current and former executive officers and members of the Board of Directors (the "Board") seeking to remedy Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available

documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Illumina, legal filings, news reports, securities analysts' reports about the Company, the securities class action suits captioned *Kangas v. Illumina, Inc.*, Case No. 3:23-cv-02082-LL-MMP (S.D. Cal.), *Louisiana Sheriffs' Pension & Relief Fund v. Illumina, Inc.*, Case No. 3:23-cv-02328-MMA-AHG (S.D. Cal.), and *Roy v. Illumina, Inc.*, Case No. 3:23-cv-02327-BEN-BGS (S.D. Cal.) (collectively, the "Securities Class Actions"), and other publicly available information.

## <u>NATURE OF THE ACTION</u>

1.     This is a shareholder derivative action brought by Plaintiff on behalf of Illumina against certain current and former officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties to the Company and its stockholders between September 21, 2020 and November 9, 2023 (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.     Illumina develops, manufactures, and markets integrated systems for large scale analysis of genetic variation and biological functions. The Company's portfolio of integrated sequencing and microarray systems, consumables, and analysis tools are designed to accelerate and simplify genetic analysis.

---

[1] The Individual Defendants are Francis A. deSouza ("deSouza"), Sam A. Samad ("Samad"), Jay Flatley ("Flatley"), Joydeep Goswami ("Goswami"), Jacob Thaysen ("Thaysen"), John Thompson ("Thompson"), Stephen P. MacMillan ("MacMillan"), Frances Arnold ("Arnold"), Caroline Dorsa ("Dorsa"), Robert S. Epstein ("Epstein") Scott Gottlieb ("Gottlieb"), Gary S. Guthart ("Guthart"), Philip Schiller ("Schiller"), Sue Siegel ("Siegel"), Andrew Teno ("Teno"), and Scott B. Ulleme ("Ulleme"). "Defendants" means Illumina and the Individual Defendants.

3.      According to the Company's public filings, in January 2016, Illumina founded and obtained a majority equity ownership interest in GRAIL, Inc. ("GRAIL"), a company formed to develop a blood test for early-stage cancer detection test. As of January 1, 2017, Illumina held a 52% equity ownership interest in GRAIL.

4.      After GRAIL underwent several rounds of capital financing in 2016, Illumina spun off GRAIL in February 2017 and retained a 20% stake.

5.      Then, on September 21, 2020, after GRAIL raised $1.9 billion from venture capitalists and strategic partners, Illumina announced that it entered into an agreement to reacquire GRAIL for approximately $8 billion.

6.      As detailed herein, throughout the Relevant Period, the Individual Defendants misled investors by continuously highlighting the benefits of its acquisition of GRAIL and misrepresenting the Company's reasons for acquiring GRAIL. Specifically, the Individual Defendants repeatedly stated that the Company's acquisition of GRAIL would "accelerate" the adoption of early multi-cancer detection tests and would save "tens of thousands of lives." However, in reality, the Company's acquisition of GRAIL was attractive because several of the Company's insiders had financial motives in the acquisition.

7.      However, the truth was revealed on August 10, 2023, when, after the market closed, Illumina revealed that the SEC was investigating the Company's acquisition of GRAIL.

8.      On this news, the Company's stock price fell 2.5%, or $4.64 per share, to close at $180.48 per share on August 11, 2023.

9.      Then, on October 17, 2023, Carl Icahn, the beneficial owner of approximately 1.4% of the Company's shares, brought a derivative and class action suit in the Delaware Court of Chancery, captioned *Icahn Partners LP v. deSouza*, 2023-1045-PAF (Del. Ch.), against Illumina

and Defendants deSouza, Thompson, Arnold, Dorsa, Epstein, Gottlieb, Guthart, Schiller, and Siegel (the "Icahn Action").

10.    On this news, the Company's stock price fell $7.42 per share, or approximately 5.6%, to close at $124.45 per share on October 18, 2023.

11.    On November 9, 2023, the Company finally revealed that its acquisition of GRAIL was not as beneficial as it made it out to be when it filed its quarterly report for the third quarter of 2023 on a Form 10-Q with the SEC (the "3Q21 10-Q"). The 3Q21 10-Q stated that the Company had taken "goodwill and intangible impairments of $821 million related to the GRAIL segment."

12.    On this news, the Company's stock price fell $8.61 per share, or approximately 8%, to close at $98.37 per share on November 10, 2023.

13.    As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants failed to disclose to investors that: (i) certain Illumina insiders had personal financial motives for acquiring GRAIL; (ii) acquiring GRAIL was not in the best interests of the Company; and (iii) as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects, specifically related to its acquisition of GRAIL, were materially misleading and/or lacked a reasonable basis.

14.    As a result of the foregoing, the Securities Class Actions were filed against the Company and Defendants deSouza, Thompson, Samad, and Goswami.  The Securities Class Actions have exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)) and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Company is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

*Plaintiff*

20.     Plaintiff is, and has been at all relevant times, a shareholder of Illumina.

*Nominal Defendant*

21.     Nominal Defendant Illumina is a Delaware corporation with its principal executive offices located in San Diego, California.  Illumina's common stock trades on the NASDAQ under the ticker symbol "ILMN."

*Individual Defendants*

22.     Defendant deSouza served as Chief Executive Officer ("CEO") and President of the Company from 2016 until June 2023 and as a director of the Company from 2014 until June 2023. deSouza previously served as the Company's President from 2013 until 2016. deSouza received $11,1733,593 in compensation from the Company in 2020, $14,333,634 in 2021, and $26,752,197 in 2022.

23.     Defendant Samad served as Chief Financial Officer ("CFO") of the Company from 2017 until July 2022. According to the Company's public filings, Samad received $2,466,176 in compensation from the Company in 2020, $3,559,621 in 2021, and $3,062,815 in 2022.

24.     Defendant Flatley served as Chair of the Board from 2016 until May 2021. Flatley previously served as a CEO, President, and a director of the Company from 1999 until 2016. Flatley also served as a member of the Company's Science and Technology Committee. According to the Company's public filings, Flatley received $636,201 in compensation from the Company in 2020, and $54,615 in 2021.

25.     Defendant Goswami has served as CFO and Chief Strategy and Corporate Development Officer of the Company since 2021. Goswami previously served as Senior Vice President of Corporate Development & Strategic Planning of the Company from 2019 until 2021. According to the Company's public filings, Goswami received $3,537,625 in compensation from the Company in 2022.

26.     Defendant Thaysen has served as CEO and a director of the Company since September 2023.

27.     Defendant Thompson served as Chair of the Board from May 2021 until May 2023. Thompson served as a director of the Company from 2017 until 2021. Thompson also served as a

member of the Company's Audit Committee. According to the Company's public filings, Thompson received $462,859 in compensation from the Company in 2020, $482,695 in 2021, and $465,078 in 2022.

28.     Defendant MacMillan has served as Chair of the Board since June 2023.

29.     Defendant Arnold has served as a director of the Company since 2016. Arnold also serves as Chair of the Company's Science and Technology Committee and a member of the Nominating/Corporate Governance Committee. According to the Company's public filings, Arnold received $440,359 in compensation from the Company in 2020, $440,374 in 2021, and $400,078 in 2022.

30.     Defendant Dorsa has served as a director of the Company since 2017. Dorsa also serves as Chair of the Company's Audit Committee and as a member of the Compensation Committee. According to the Company's public filings, Dorsa received $458,359 in compensation from the Company in 2020, $455,374 in 2021, and $415,078 in 2022.

31.     Defendant Epstein has served as a director of the Company since 2012. Epstein also serves as Chair of the Company's Nominating/Corporate Governance Committee and as a member of the Compensation Committee.  According to the Company's public filings, Epstein received $448,359 in compensation from the Company in 2020, $445,374 in 2021, and $405,078 in 2022.

32.     Defendant Gottlieb has served as a director of the Company since 2020. Gottlieb also serves as a member of the Company's Nominating/Corporate Governance Committee. According to the Company's public filings, Gottlieb received $525,850 in compensation from the Company in 2020, $419,577 in 2021, and $385,078 in 2022.

33.     Defendant Guthart has served as a director of the Company since 2017. Guthart also serves as Chair of the Company's Compensation Committee and a member of the Science and

Technology Committee. According to the Company's public filings, Guthart received $450,359 in compensation from the Company in 2020, $450,374 in 2021, and $410,078 in 2022.

34.     Defendant Schiller has served as a director of the Company since 2016. Schiller also serves as a member of the Company's Nominating/Corporate Governance Committee and the Science and Technology Committee. According to the Company's public filings, Schiller received $435,359 in compensation from the Company in 2020, $435,374 in 2021, and $395,078 in 2022.

35.     Defendant Siegel has served as a director of the Company since 2019. Siegel also serves as a member of the Company's Audit Committee. According to the Company's public filings, Siegel received $430,359 in compensation from the Company in 2020, $430,374 in 2021, and $390,078 in 2022.

36.     Defendant Teno has served as a director of the Company since May 2023. Teno also serves as a member of the Company's Compensation Committee.

37.     Defendant Ullem has served as a director of the Company since June 2023. Ullem also serves as a member of the Company's Audit Committee.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

38.     By reason of their positions as officers and/or directors of Illumina, and because of their ability to control the business and corporate affairs of Illumina, the Individual Defendants owed Illumina and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Illumina in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Illumina and its shareholders.

39.     Each director and officer of the Company owes to Illumina and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

40.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Illumina, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

41.     To discharge their duties, the officers and directors of Illumina were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

42.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Illumina, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

43.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts

described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

44.    To discharge their duties, the officers and directors of Illumina were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Illumina were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Illumina's own Code of Conduct;

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how Illumina conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Illumina and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Illumina's operations would comply with all applicable laws and Illumina's financial statements and regulatory filings filed with the SEC and

disseminated to the public and the Company's shareholders would be accurate;

(vi)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)   Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

45.     Each of the Individual Defendants further owed to Illumina and the shareholders the duty of loyalty requiring that each favor Illumina's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

46.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Illumina and were at all times acting within the course and scope of such agency.

47.     Because of their advisory, executive, managerial, and directorial positions with Illumina, each of the Individual Defendants had access to adverse, non-public information about the Company.

48.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Illumina.

## ILLUMINA'S CODE OF CONDUCT

49.     Illumina's Code of Conduct applies to all of the Company's "employees, consultants, temporary workers, officers, and members of the Board of Directors."

50.     The Code of Conduct states that its purpose is to "promote honest and ethical conduct, compliance with applicable laws and regulations, and to ensure the protection of [] business interest, including corporate assets and information."

51.     In a section titled "Compliance with Law," the Code of Conduct states:

You are required to follow high ethical standards and comply fully with both the spirit and the letter of all applicable laws and regulations. In particular, you must observe these standards when addressing the special requirements often associated with government transactions or when dealing with government officials, representatives, or agencies that regulate the markets in which we do business. Whenever a law or regulation is unclear or seems to conflict with either another law or any provision of this Code or other Company policy or procedure, you should seek clarification from your supervisor. If your supervisor is unable to assist, you should seek clarification from the Legal department.

52.     In a section titled "Public Reporting," the Code of Conduct states:

Accurate information is essential to the Company so that we can make good business decisions, and externally so that customers, investors, and the government can accurately assess the Company. This is why we require that all of the Company's books and records be fair, accurate, timely, complete, and understandable.

This requires that we maintain the integrity of our accounting and internal control system, that all transactions are valid, accurate, complete and supportable, and that they are promptly recorded in the Company's books. Our reports and documents filed with or submitted to the Securities and Exchange Commission and the Company's other public communications, shall include full, fair, accurate, timely, and understandable disclosure. All personnel are responsible for using their best efforts to ensure that the Company meets these requirements.

Our Responsibilities

• Always be truthful in making any records or reports for the Company. This requires that all statements be truthful, complete, and never misleading or inappropriately suggestive.

• All records and reports of the Company must accurately reflect the truth of the underlying transaction or event. Never record false sales or shipments, understate or overstate known liabilities and assets, or defer recording items that should be expensed.

• All financial records must conform both to generally accepted accounting principles and to the Company's systems of internal controls.

• Implement appropriate internal controls, including proper segregation of job duties, monitoring of business processes for unusual items or activities, and limiting and controlling access to Company resources.

• Report known or suspected fraudulent, illegal, or unethical activities, including for example, misapplication or theft of funds, impropriety with respect to reporting financial transactions, forgery or alteration of documents, misuse of Company confidential information.

• Only sign documents, including contracts, that you are authorized to sign and that you believe are accurate.

• Contact the Legal department if there is any doubt about the appropriateness of document retention or destruction of records.

## ILLUMINA'S AUDIT COMMITTEE CHARTER

53. Illumina's Audit Committee Charter states that the Audit Committee "oversees Illumina's accounting and financial reporting processes, including internal control over financial reporting, and audits of its financial statements on behalf of the Board of Directors and provides advice with respect to the Company's risk evaluation and mitigation processes."

54. The Audit Committee Charter states that the purpose of the Audit Committee is to monitor and advise the Board on:

1. the integrity of the Company's financial statements and disclosures;

2. the Company's independent registered public accounting firm's qualifications, independence, and performance;

3. the performance of the Company's internal audit function;

4. the adequacy and effectiveness of the Company's internal controls;

5. the Company's compliance with legal and regulatory requirements; and

6. the processes utilized by management for identifying, evaluating, and mitigating strategic, financial, operational, regulatory, compliance, litigation, information security, and external risks inherent in the Company's business (the "Risks").

55.     The Audit Committee Charter states that the Audit Committee shall be responsible for the following, among other things:

**Financial Statements and Disclosures:**

1. Review with management and the Company's independent registered public accounting firm the annual audited financial statements, including disclosures made in management's discussion and analysis, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

2. Review with management and the Company's independent registered public accounting firm the quarterly reports of the Company prior to filing of such reports with the SEC, including the results of the independent registered public accounting firm's review of the quarterly financial statements.

3. Review with management and the Company's independent registered public accounting firm the Company's earnings press releases as well as financial information and earnings guidance provided to analysts, including the use of "pro forma" or "adjusted" non-GAAP information and its reconciliation to GAAP.

4. Review with management any significant changes to GAAP, SEC, and other accounting standards that will impact or could impact the financial reports under review.

5. Review with management and the Company's independent registered public accounting firm significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements.

6. Periodically review with management and the Company's independent registered public accounting firm the Company's application of critical accounting policies and its consistency from period to period, and the compatibility of these accounting policies with generally accepted accounting principles, and (where appropriate) the Company's provisions for future occurrences that may have a material impact on the financial statements of the Company.

7. Review with management all material off-balance sheet transactions, arrangements, obligations (including contingent obligations) and other relationships of the Company with unconsolidated entities or other persons that may have a material current or future effect on the Company's financial condition, results of operations, liquidity, capital resources, capital reserves or significant components of revenues or expenses.

8. Review with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including review and approval of swap transactions (which may include the review and amendment of policies with regard to the investment of the Company's assets or foreign exchange risk management).

9. Review with the Company's independent registered public accounting firm the matters required by Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 1301 ("Communications with Audit Committees"), relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restriction on the scope of activities or access to requested information, any significant disagreements with management, and any critical audit matters.

10. Periodically review with the Company's independent registered public accounting firm, without management being present, (a) their judgments about the quality, appropriateness, and acceptability of the Company's accounting principles and financial disclosure practices, as applied in its financial reporting, and (b) the completeness and accuracy of the Company's financial statements. . . .

**Internal Controls:**

1. Oversee the adequacy of the Company's system of internal controls and review with management, the internal audit department, and the Company's independent registered public accounting firm the adequacy and effectiveness of the Company's internal controls, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such internal controls. Review and discuss with management and the Company's independent registered public accounting firm disclosure relating to the Company's internal controls, the independent registered public accounting firm's report on the effectiveness of the Company's internal control over financial reporting, and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

2. Review the Company's results of quarterly Disclosure Committee meetings.

**Compliance with Legal and Regulatory Requirements:**

1. Establish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal controls, or auditing matters.

2. Establish procedures for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

3. Oversee the Company's compliance with the Foreign Corrupt Practices Act and other applicable anti-corruption regulations, including the Company's Anti-Bribery Policy.

4. Oversee the Company's compliance with SEC requirements for disclosure of accountant's services and Audit Committee members and activities.

5. Review with management and the Company's independent registered public accounting firm any correspondence with financial and accounting related regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies.

6. Oversee and approve material amendments to the Company's Insider Trading Compliance Program, Insider Trading Policy, and the Charter of the Company's Compliance Committee.

7. Review and take appropriate action with respect to any reports to the Audit Committee from legal counsel for the Company concerning any material violation of securities laws or breach of fiduciary duty or similar violation by the Company, its subsidiaries, or any person acting on their behalf.

**Risks:**

1. Periodically review and evaluate the processes utilized by management to identify and assign relative weights to Risks.

2. Assess the adequacy of management's Risk assessment and mitigation processes, including with respect to insurance coverage and programs.

3. Review and assess the adequacy of the Company's public disclosures related to Risks.

4. Review and assess material litigation matters, including with respect to treatment in the Company's financial statements and disclosures.

5. Review and assess the risk of fraud and the Company's antifraud programs and controls.

6. Review and assess the Company's cybersecurity and other information technology risks, controls, and procedures, including the Company's plans to mitigate cybersecurity risks and to respond to data breaches, including any specific cybersecurity issues that could affect the adequacy of the Company's internal controls.

## SUBSTANTIVE ALLEGATIONS

### *Background*

56.     Illumina is a global leader in sequencing- and array-based solutions for genetic and genomic analysis. The Company develops, manufactures, and markets integrated systems for large scale analysis of genetic variation and biological functions. The Company's portfolio of integrated sequencing and microarray systems, consumables, and analysis tools are designed to accelerate and simplify genetic analysis.

57.     According to the Company's public filings, in January 2016, Illumina founded and obtained a majority equity ownership interest in GRAIL, a company formed to develop a blood test for early-stage cancer detection test. As of January 1, 2017, Illumina held a 52% equity ownership interest in GRAIL.

58.     GRAIL's primary cancer screening test is "Galleri," which is a multi-screening cancer test that can detect more than fifty cancer types.

59.     After GRAIL underwent several rounds of capital financing in 2016, Illumina spun off GRAIL into a privately held company in February 2017. Illumina retained a 20% stake in GRAIL.

60.     Then on September 21, 2020, after GRAIL raised nearly $2 billion from venture capitalists and strategic partners to further develop Galleri, Illumina announced that it entered into an agreement to reacquire GRAIL for approximately $8 billion.

61.     Under the terms of the acquisition, Illumina would acquire GRAIL for $3.5 billion in cash and $4.5 billion in shares of Illumina common stock.

62.     Illumina completed the acquisition of GRAIL on August 18, 2021.

*Individual Defendants' Materially False and Misleading Statements*

63.     Throughout the Relevant Period, the Company continuously highlighted the benefits of its acquisition of GRAIL to the public and misled investors on the Company's reasons for entering into the acquisition.

64.     For instance, in Illumina's September 21, 2020 press release announcing the acquisition of GRAIL, the Company touted the benefits of the acquisition, stating that the following were "strategic benefits" for Illumina:

> ● **Increases Illumina's Directly Accessible Total Addressable Market and Offers Multiple Future Growth Opportunities**.  GRAIL extends Illumina's portfolio to include cancer screening, diagnosis and cancer monitoring, creating a portfolio of best-in-class, proprietary tests in each of the major oncology testing application areas. Oncology test utilization and payor coverage is accelerating, and the total NGS oncology opportunity is expected to grow at a CAGR of 27% to $75 billion in 2035.

> ● **Accelerates Adoption of NGS-Based Early Multi-Cancer Detection Test to Reach More Patients Faster.**  Illumina plans to leverage its global scale, manufacturing and clinical capabilities to support GRAIL's commercialization efforts, realize the total addressable market potential and drive significant growth in the clinical value chain.

> ● **Enhances Illumina's Position in Clinical Genomics.**  NGS is poised to revolutionize oncology care, and this acquisition allows Illumina to participate more fully in the high value clinical solutions that are enabled by its NGS sequencing technology.   With GRAIL, Illumina will continue as a leading sequencing innovator and partner, while also becoming a proprietary test provider.

65.     Furthermore, in the same press release, Defendant deSouza stated that:

> Together, we have an important opportunity to introduce routine and broadly available blood-based screening that enables early cancer detection when treatment can be more effective and less costly.  Multi-cancer early detection is better for patients, their physicians, and payors. As we accelerate our path to clinical leadership and the path to multi-cancer early detection, we will continue to drive significant value creation for our stockholders.

66.     On October 29, 2020, the Company held an earnings call for the third quarter of 2020 for investors and analysts (the "3Q20 Earnings Call"). In the 3Q20 Earnings Call, Defendant

deSouza stated:

> We believe our planned acquisition of GRAIL will accelerate a new era of early cancer detection, transforming cancer survivability and opening up the largest clinical application of genomics we've seen. We look forward to welcoming our GRAIL colleagues to Illumina when the acquisition closes. Upon close, we expect to operate GRAIL as a division within Illumina. We remain committed to supporting all of Illumina's customers and ensuring that innovators who wish to develop NGS-based tests have continued access to our technologies.

67. Additionally, in the "Questions and Answers" portion of the 3Q20 Earnings Call, an analyst asked, "one of the key questions that has emerged . . . is the approach that Illumina took to GRAIL's acquisition in light of another multi-cancer liquid biopsy acquisition this week . . . could you elaborate, if there is anything . . . that gives you a greater confidence and a higher valuation." In response, Defendant Samad stated:

> What attracted us to GRAIL was its unique position in that market in terms of being the closest to having a commercial test and in terms of having the performance characteristics, consistent with being closer to having a commercial test. So, GRAIL is looking to launch its test next year and that will likely make them the first player into the market. We have also undertaken by far some of the largest clinical studies in that space. And so, they have over 100,000 people enrolled in the studies that they've done and generated quite a remarkable bolus of data associated with their test. And then the performance characteristics of their tests are very strong. So, for the 12 deadliest cancers, they have a sensitivity in the high-60% with a false-positive rate of less than 1%, which really does represent our best-in-class product at this time in the market.

> What we also like to is that the only player at this point that has FDA approval in terms of being able to run an IDE study to return results to patients and so they are working with some of the premier healthcare systems, including the Mayo Clinic, Cleveland, Oregon Health System, the Intermountain Health System, Dana-Farber, Sutter Health and so they already have their gallery test in the hands of doctors returning results to patients as part of the study. And so, having that FDA approval is also very attractive is and all of that obviously factored into the price associated with GRAIL.

68. In the Company's quarterly report for the period ended September 27, 2020, filed with the SEC on October 30, 2020 on a Form 10-Q (the "3Q20 10-Q"), the Company stated that "[w]e believe that our acquisition of GRAIL will accelerate the adoption of NGS-based early

multi-cancer detection tests, enhance our position in Clinical Genomics, and increase our directly accessible total addressable market." The 3Q20 10-Q was signed by Defendant Samad.

69.     On March 30, 2021, the Federal Trade Commission ("FTC") announced that it filed an administrative complaint and authorized a federal lawsuit to block Illumina's proposed acquisition of GRAIL. The FTC complaint alleged that the proposed acquisition of GRAIL was anticompetitive and would diminish innovation in the United States market for multi-cancer early detection tests.

70.     Illumina issued a press release on March 30, 2021 in response to the FTC's announcement. In the press release, Illumina stated that it "disagrees with, and will oppose, the U.S. Federal Trade Commission (FTC)'s challenge to its previously announced acquisition of GRAIL." The March 30, 2021 press release touted the benefits of the acquisition, stating:

> Illumina originally founded GRAIL five years ago and the two companies do not compete in any way. In reuniting the two organizations, Illumina will leverage its global scale of manufacturing and clinical capabilities, as well as its global regulatory and reimbursement expertise, to bring early-stage, multi-cancer testing to patients more quickly and more affordably, resulting in more lives being saved. . . .
>
> Illumina strongly believes that acquiring GRAIL is in the best interests of patients, is procompetitive, and benefits the multi-cancer early detection field as a whole.

71.     On this news, the Company's stock price fell $25.44 per share, or approximately 6.5%, going from $394.40 at open on March 30, 2021 to close at $368.96 on March 30, 2021.

72.     On April 20, 2021, the European Commission announced that it was asserting its jurisdiction to review Illumina's acquisition of GRAIL.

73.     Despite these announcements, Illumina continued to double down on its acquisition of GRAIL, and the benefits to investors and the public associated therewith.

74.     On April 20, 2021, in response to the European Commission's announcement, the Company issued a press release stating that Illumina "disagrees with the European Commission's Directorate-General for Competition's decision to review Illumina's acquisition of GRAIL." In the press release, Defendant deSouza emphasized the benefits of the acquisition and the Company's reasons for the acquisition, stating that "[r]euniting GRAIL and Illumina will allow us to bring GRAIL's breakthrough early detection multi-cancer test to patients across the world faster and consequently save lives."

75.     On April 27, 2021, Illumina held its earnings call for the first quarter of 2021 for investors and analysts ("Q121 Earnings Call"), where Defendant deSouza stated that:

> Our commitment to the advancement of human health is an Illumina core tenet, which brings me to GRAIL. We are pleased with the progress GRAIL is making and remain committed to pursue the completion of the GRAIL acquisition. GRAIL recently presented affirmative data from its CCGA3 study at the American Association for Cancer Research Annual Meeting and is expecting to launch Galleri, its breakthrough multi-cancer early detection screening test, in Q2. One of the many reasons we decided to acquire GRAIL was to accelerate patient access to breakthrough multi-cancer early detection blood tests, which could save tens of thousands of lives. We are committed to supporting all our customers and strongly believe that our acquisition of GRAIL is pro-competitive. We expect the acquisition to accelerate the early detection of cancer market as a whole. We saw a similar dynamic play out in the noninvasive prenatal testing market where, after Illumina's entry, the market grew and prices decreased, making these important tests accessible to a much larger population of pregnant women.

76.     On May 13, 2021, Defendant Samad attended the Bank of America Global Research Healthcare Conference on behalf of the Company. Defendant Samad stated, in response to a question by an analyst about why the Company chose to acquire GRAIL:

> So why GRAIL? I mean it's the single most compelling, I would say, application that's going to be coming up in human health over the next, I don't know, how many years. But we're talking about a $60 billion TAM, you're talking about the potential to save lives. You're talking about the potential to save significant costs in health care when you're able to catch cancer early in stages 1 and 2 as opposed to stages 3 and 4.

> In addition to that, we believe the profile of the Galleri product is well above and well beyond any other product that's to be introduced in that space with regards to their positive predictive value, the specificity and sensitivity of the product and the number of clinical trials that have been undergone in that space to prove that out. So that's why GRAIL and why now. I mean we think there's tremendous momentum in this market where we want to participate more directly in that clinical ecosystem.

77.     Then on July 13, 2021, it was revealed that the European Union was demanding concessions from Illumina in connection with the European Commission's decision to review Illumina's acquisition of GRAIL.

78.     On this news, Illumina's stock price fell $22.60 per share, or approximately 4.7%, to close at $460.92 on July 14, 2021.

79.     However, the Individual Defendants once again chose to double down on Illumina's reasons for acquiring GRAIL and the benefits associated therewith. The Company held an earnings call for the second quarter of 2021 on August 5, 2021 (the "2Q21 Earnings Call"). In the 2Q21 Earnings Call, Defendant deSouza, when asked about the Company's acquisition of GRAIL and the issues encountered in the process, stated:

> We continue to believe that this deal is procompetitive. We continue to believe that this deal will result in the savings of tens of thousands of lives that would not be saved if we didn't buy GRAIL just simply because we can accelerate the business. So to answer the question, we are committed to working through this deal through that time frame through the end of the year.

80.     Then, on August 18, 2021, the Company issued a press release announcing that it completed the acquisition of GRAIL.

81.     On this news, Illumina's stock price fell $40.25 per share, or approximately 7.9%, to close at $470.36 on August 19, 2021.

82.     Following the completion of the acquisition, the Individual Defendants continued to mislead the public about the reasons for Illumina's acquisition of GRAIL. For instance, on

September 13, 2021, Defendant deSouza attended the Morgan Stanley Global Healthcare Conference on behalf of Illumina, where, in response to a question about Illumina's reasons for acquiring GRAIL, he stated:

> In addition to the considerations around shareholder value and making sure we're doing the move that long term maximizes shareholder value, we also felt a moral obligation to close the deal because the potentially life savings, the savings life associated with doing this deal are so substantial. By accelerating GRAIL in terms of its global distribution and the accessibility of the tests globally, we will save many thousands of lives by getting this test into the hands of more people and making it more affordable than GRAIL would do on their own. And so, there was a moral element here, too, by saying in addition to creating long-term shareholder value, we have an obligation to have this deal reviewed and get to a decision because of the life-saving potential of doing this deal. And so all those considerations came together and that's how we made the decision.

83.     Then, on October 29, 2021, it was revealed that the European Commission ordered Illumina to adopt interim measures to ensure that Illumina and GRAIL were kept separate and run by independent managers.

84.     However, the Individual Defendants again touted the benefits of the acquisition to investors. On November 4, 2021, the Company held its earnings call for the third quarter of 2021 for investors and analysts (the "3Q21 Earnings Call"). In the 3Q21 Earnings Call, Defendant deSouza stated "[i]n August, we closed our acquisition [of GRAIL], which we believe we believe will help accelerate patient access and affordability for multi-cancer early detection screening."

85.     Furthermore, in the 3Q21 Earnings Call, Defendant deSouza, in response to a question about the future of GRAIL's revenue performance given the regulatory investigations, stated:

> But what we want to do is make sure that GRAIL continues to create value because what that means is that no matter what scenario plays out in the event that we get done and we have GRAIL and we can grow it, that's a huge, huge success, obviously, and hugely valuable for our shareholders. But we know that if we create a lot of value in GRAIL, then no matter what the regulatory outcome is, it's still a big win, not only for people who are getting screened but also for our shareholders

because we'll have an asset significantly appreciated. And even if you look at the progress that's been made at GRAIL since we announced the deal, right? So since we announced the deal, they've published some of their study results. They have launched a product on the schedule they set in June. They have initiated -- not only signed the NHS deal but started the rollout to 140,000 customers and signed up some other healthcare systems and employers in the U.S. So it's clear the business has created significant value from maybe 12, 15 months ago when we announced the deal.

86.     On May 12, 2022, Defendant Samad attended the Bank of America Healthcare Conference on behalf of Illumina, where he touted the benefits of Illumina's acquisition of GRAIL to investors and analysts. Defendant Samad stated that the GRAIL test "and other revenue from GRAIL could potentially be even larger than our core business . . . that's how transformational this product is."

87.     Then, on September 6, 2022, the European Commission announced that it completed its review of Illumina's acquisition of GRAIL and that its final decision was a prohibition of Illumina's acquisition of GRAIL.

88.     On the same day, the Company issued a press release, stating that it was "disappointed with the European Commission's decision" and again touted the benefits of the acquisition, stating that "[t]he merger of Illumina and GRAIL would usher in a transformational phase in the detection and treatment of cancer by facilitating equal and affordable access to the life-saving early cancer detection Galleri test."

89.     On October 3, 2022, Illumina held its annual "Investor Day" meeting for investors and analysts, where Defendant deSouza stated, "we believe Illumina's acquisition of GRAIL can have lifesaving benefits for people who have cancer and don't know about it. And we also believe it creates long-term shareholder value for Illumina's shareholders, which is why we did the deal."

90.     On February 17, 2023, the Company filed its annual report for the fiscal year ended January 1, 2023 on a Form 10-K with the SEC (the "2023 10-K"), which stated that "[w]e believe

our acquisition of GRAIL will accelerate the adoption of next-generation sequencing (NGS) based early multi-cancer detection tests, enhance our position in Clinical Genomics, and increase our directly accessible total addressable market." The 2023 10-K was signed by Defendants deSouza, Goswami, Thompson, Arnold, Dorsa, Epstein, Gottlieb, Guthart, Schiller, and Siegel.

91.     On April 3, 2023, the FTC announced that it issued an order and opinion requiring Illumina to divest GRAIL.

92.     Then, on April 24, 2023, an article was posted on *Nongap Investing*, stating that Illumina insiders received a financial windfall "in excess of $500 million" from the spinoff and reacquisition of GRAIL. The author of the article alleged that "up to 70 million Grail shares went to insiders, right out-of-the-gate."

93.     On May 1, 2023, Carl Icahn, the beneficial owner of 1.4% of the Company's shares as of February 17, 2023, published an open letter to Illumina shareholders, questioning Illumina's acquisition of GRAIL and alleging that the acquisition of GRAIL was entered into to enrich the Company's directors and executives. The letter stated, in relevant part:

> Recently, however, some of these issues have found their way into various publications. For example, we made reference last week to an interesting piece, entitled "Malignant Governance," which asked: ***"How much money did Illumina insiders (past and present) make from splitting-off and subsequently re-acquiring Grail?"*** The same author published an equally interesting follow-up over the weekend, entitled, "Non-GAAP Activism," which declared: ***"If Illumina insiders were able to reap sizable, undisclosed financial windfalls splitting-out and subsequently re-acquiring Grail, the wrath of the shareholders likely plays second fiddle to the potential regulatory response and investigation."*** We obviously agree with that statement and would be shocked if regulators were not at least as interested as we are in learning whether there is any merit to the issues raised in these pieces. Finally, the author also voiced the same frustration we have heard relentlessly from shareholders, who believe – as we do – that <u>we deserve answers</u>: ***"I think Illumina didn't help themselves slipping disclosures regarding additional D&O insurance for the Grail deal (even if it's supposedly "standard") and the intent to appoint 2 new Directors after Carl Icahn's proxy fight. It continues a pattern of (suspiciously) non-existent/vague disclosures and further erodes shareholder trust, especially when serious questions regarding the "real***

> *reason" Illumina (defiantly) completed the Grail deal without securing regulatory approval (a critical contractual "condition" in the merger agreement) remain unclear. The lack of clarity has gotten to the point where proxy advisors and significant shareholders need to demand greater transparency and clearer answers to the potential conflicts of interests that may have swirled the Grail deal and influenced value destructive decision-making."*

> As we previously stated, we have no idea if any of the allegations in these pieces are true. However, based on what we <u>do</u> know of the past actions and lack of transparency exhibited by Illumina CEO Francis deSouza and the incumbent directors, we would not be surprised at all if some or all of the assertions in these pieces turned out to be accurate. <u>We therefore implore the board to bring in an outside – and demonstrably independent – law firm and forensic accounting team to investigate and address these questions publicly, with enough time prior to the upcoming annual meeting to allow shareholders to take the results into account when casting their votes for directors</u>. We believe that an unbiased investigation into these murky issues is necessary and appropriate, given the fact that the director election will in effect be a referendum on the entire GRAIL fiasco.[2]

94.     In the May 1, 2023 letter, Carl Icahn also called for the Company to replace three of its directors with new "more qualified, independent" directors.

95.     In response, Illumina issued a press release on May 1, 2023 and enclosed a letter to its shareholders, asking shareholders to reject Carl Icahn's nominees for the Board and doubling down on its decision to acquire GRAIL. The letter continued to tout the benefits of the acquisition, stating that "GRAIL is a growth engine with unprecedented potential for Illumina, and it continues our strategy of platform-enhancing acquisitions that ultimately accelerate growth and deliver value for shareholders."

96.     The letter went on to deny all of Carl Icahn's accusations, stating:

**2016 GRAIL spin-out from Illumina**

> An inflammatory blog post, repeated by Icahn, incorrectly suggested that Illumina spun out and reacquired GRAIL in order to enrich Illumina's directors and executives. Icahn himself, however, admits "We have no idea if the allegations are true."

---

[2] All emphasis is added unless otherwise indicated.

The allegations are completely false.

The facts are as follows:

● None of Illumina's directors involved in either the decision to sign or the decision to close the GRAIL acquisition – including our former CEO and Executive Chairman Jay Flatley, our current CEO Francis deSouza and each of Illumina's current directors – has ever held any equity interests in GRAIL.

● At the time of Illumina's various investment rounds in GRAIL, no individuals at Illumina were investors in GRAIL. Illumina's employees, executive officers and Board members were not permitted to participate in GRAIL investment rounds and did not otherwise receive any GRAIL equity.

● Illumina, Inc. was the founder of GRAIL and individuals employed by Illumina moved to GRAIL as part of the spin-out in 2016. Those who moved to GRAIL terminated their relationship with Illumina at the time of transition and directors and employees who remained at Illumina could not invest in GRAIL nor did they receive any GRAIL equity.

● No executive officers of Illumina held GRAIL shares at the signing or closing of the GRAIL acquisition, other than Alex Aravanis, who Illumina had hired from GRAIL, and Mostafa Ronaghi, Illumina's former CTO, who received GRAIL shares upon joining GRAIL's board in May 2020. The economic interests and relationships of these individuals with GRAIL were fully disclosed to, and known by, Illumina and its Board, and, consistent with good corporate governance practices, both were recused from any decisions to sign and close the GRAIL acquisition.

97.     On this news, the Company's stock price fell $7.15 per share, or approximately 3.5%, to close at $195.16 per share on May 2, 2023.

98.     Despite these disclosures, the Individual Defendants continued to mislead the public about the Company's reasons for acquiring GRAIL. On May 18, 2023, Illumina issued a press release, which contained a letter from Defendant Thompson, which stated:

On conflicts of interest, there is an important question I would like to put to bed: "Did any Illumina directors have a financial interest in GRAIL at the time of the acquisition?" This question is not a matter of interpretation or explanation. The answer is simply no. *As we have said before, no director who oversaw any part of the GRAIL transaction has ever owned any equity interest in GRAIL – that includes Jay Flatley, Francis deSouza, myself, and any member of the Board now or at the time of acquisition.* In addition, no executive officers of Illumina held

27

GRAIL shares at the signing or closing of the GRAIL acquisition (including indirect ownership interests such as through trusts, LP or GP stakes in investment vehicles, or through derivative securities), other than Alex Aravanis, who Illumina had hired from GRAIL, and Mostafa Ronaghi, Illumina's former CTO, who received GRAIL shares upon joining GRAIL's Board in May 2020. The economic interests and relationships of these individuals with GRAIL were fully disclosed to, and known by, Illumina and its Board, and, consistent with good corporate governance practices, both were recused from any decisions to sign and close the GRAIL acquisition. In addition, Illumina's Board engaged Goldman Sachs as its financial advisor in connection with the GRAIL acquisition and Goldman, acting exclusively for Illumina, delivered a customary fairness opinion to Illumina's Board immediately prior to Illumina entering into the GRAIL acquisition agreement.

99.     The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (i) certain Illumina insiders had personal financial motives for acquiring GRAIL; (ii) acquiring GRAIL was not in the best interests of the Company; and (iii) as a result of the foregoing, the Individual Defendant's positive statements about the Company's business, operations, and prospects, specifically related to GRAIL, were materially misleading and/or lacked a reasonable basis.

***The Truth is Revealed***

100.     The truth was revealed when, on August 10, 2023, after the market closed, Illumina disclosed that the SEC was investigating its acquisition of GRAIL. The Company's quarterly reported for the second period of 2023 filed on a Form 10-Q with the SEC stated:

In July 2023, we were informed that the staff of the SEC was conducting an investigation relating to Illumina and was requesting documents and communications primarily related to Illumina's acquisition of GRAIL and certain statements and disclosures concerning GRAIL, its products and its acquisition, and related to the conduct and compensation of certain members of Illumina and GRAIL management, among other things. Illumina is cooperating with the SEC in this investigation.

101.     On this news, the Company's stock price fell $4.64 per share, or approximately 2.5%, to close at $180.48 per share on August 11, 2023.

102.     On October 12, 2023, the European Union ordered Illumina to unwind its transaction with GRAIL and "restore its situation prevailing before the completion of the acquisition."

103.     Then, on October 17, 2023, Carl Icahn, through his partners, filed the Icahn Action against Illumina and Defendants deSouza, Thompson, Arnold, Dorsa, Epstein, Gottlieb, Guthart, Schiller, and Siegel. The Icahn Action alleged that Illumina's acquisition of GRAIL was wrongful and that the "[d]efendants have entrenched themselves on the Board wrongfully – and orchestrated Illumina's widely-reported 'crusade' and 'obsessive quest' to complete Illumina's acquisition of GRAIL."

104.     On this news, the Company's stock price fell $7.42 per share, or approximately 5.6%, to close at $124.45 per share on October 18, 2023.

105.     The truth was fully revealed on November 9, 2023, when the Company filed its 3Q23 10-Q and revealed that its acquisition of GRAIL was not as beneficial as it had made it out to be, stating that the Company had taken "goodwill and intangible impairments of $821 million related to the GRAIL segment."

106.     On this news, the Company's stock price fell $8.61 per share, or approximately 8%, to close at $98.37 per share on November 10, 2023.

107.     Finally, on December 17, 2023, after the Fifth Circuit Court of Appeals issued an opinion finding that there was sufficient evidence supporting the FTC's ruling that Illumina is required to divest GRAIL, the Company announced that it was going to divest GRAIL, with the goal of finalizing the terms of the divestment by the second quarter of 2024.

*Harm to the Company*

108.   As a direct and proximate result of the Individual Defendants' misconduct, Illumina has lost and expended, and will lose and expend, millions of dollars.

109.   Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Actions filed against the Company and Defendants deSouza, Thompson, Samad, and Goswami, the Icahn Action, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

110.   Furthermore, the Securities Class Actions and Icahn Action have exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

111.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

112.   Illumina is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

113.   Plaintiff is a current shareholder of Illumina and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

114.   A pre-suit demand on the Board of Illumina is futile and, therefore, excused.  At the time this action was commenced, the eleven-person Board consisted of Individual Defendants MacMillan, Thaysen, Arnold, Dorsa, Epstein, Gottlieb, Guthart, Schiller, Siegel, Teno, and Ullem (the "Director Defendants"). As set forth below, at least seven of the Director Defendants are

incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

115.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

116.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

117.    Specifically, Director Defendants Arnold, Dorsa, Epstein, Gottlieb, Guthart, Schiller, and Siegel were on the Board at the time the Company entered into the agreement to acquire GRAIL on September 21, 2020 and are named as defendants in the Icahn Action. As such, they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood for the misconduct alleged herein.

118.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

119.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the

Company.

120.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

121.    Defendants Dorsa, Gurthart, and Ullem (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

122.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the

Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

123.    Accordingly, a pre-suit demand on the Board is futile and excused.

## COUNT I

### Against the Individual Defendants for Violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

126.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

127.    The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

128.    The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Illumina were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to

the investing public; and (iii) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

129.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Illumina, their control over, and/or receipt and/or modification of Illumina's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Illumina, participated in the fraudulent scheme alleged herein.

130.    As a result of the foregoing, the market price of Illumina common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Illumina common stock in purchasing Illumina common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

131.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Actions and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Actions.

## <u>COUNT II</u>

### Against the Individual Defendants for Breach of Fiduciary Duty

132.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

134.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

135.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

136.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

137.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Actions, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Actions, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

140.    Plaintiff on behalf of Illumina has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

141.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Illumina.

143.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Illumina that was tied to the performance or artificially inflated valuation of Illumina, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

144.    Plaintiff, as a shareholder and a representative of Illumina, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

145.    Plaintiff on behalf of Illumina has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

146.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

148.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Actions.

149.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

150.    Plaintiff on behalf Illumina has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein,

together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: February 21, 2024

**RIGRODSKY LAW, P.A.**

By:  _/s/ Gina M. Serra_
Seth D. Rigrodsky (#3147)
Gina M. Serra (#5387)
Herbert W. Mondros (#3308)
300 Delaware Avenue, Suite 210
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
sdr@rl-legal.com
gms@rl-legal.com
hwm@rl-legal.com

**OF COUNSEL:**

**MELWANI & CHAN LLP**
Gloria Melwani
1180 Avenue of the Americas
8th Floor
New York, NY 10036
Telephone: (212) 382-4620

_Attorneys for Plaintiff_